[2336.]

## JOHN DAVIS *v.* THE STATE.

1. MAIMING—INDICTMENT which, otherwise correct, charges an accused with willfully and maliciously shooting off the toe of another, is sufficient to charge the offense of maiming, as that offense is defined by Article 507 of the Penal Code.

2. SAME—CHARGE OF THE COURT, in a prosecution for maiming, which defined the terms "wilfully and maliciously" in accordance with the previous decisions of this court, was correct. In a prosecution for

*assault* with *intent* to maim, however, the State would be bound to show that specific intent, and the trial court would be required to charge upon the same. See the opinion *in extenso* on the question.

3. SAME.—Under an indictment for maiming, the defendant could not be convicted of an assault with an intent to murder, and therefore the trial court properly so instructed the jury in view of evidence indicating the intent to have been to murder.

4. SAME—FACT CASE.—See evidence *held* sufficient to warrant a conviction for maiming.

APPEAL from district court of Denton. Tried below before the Hon. F. E. Piner.

The conviction in this case was for maiming one C. B. Marsters by shooting off his toe. The penalty assessed against the appellant was a term of two years in the penitentiary.

C. B. Marsters was the first witness for the State. He testified that on the morning of April 7, 1886, he went with his wagon to the pasture of Sam Reynolds, in Denton county, to get a load of wood. While engaged in loading his wagon, at a point some fifteen or twenty feet from the pasture fence, along which the public road ran, the defendant rode up and proceeded to curse and abuse the witness, calling him a "G—d d—d Yankee son of a b—h," and threatened to kill the witness. Witness told defendant to go away and let him alone. Defendant again cursed the witness and denounced him as before, and finally left, saying that he would go and get a gun, return and kill the witness. Witness finished loading the wagon and started home. He had driven his wagon out of the pasture and a short distance down the road when he saw the defendant coming down the road, meeting him, armed with a shot gun. He was coming from the direction of J. D. Hunter's house. Defendant stopped some fifteen or twenty feet in front of witness's team, proceeded to curse witness, called witness a d—d son of a b—h, and said that he was going to kill witness, at the same time covering witness with his gun. Witness jumped from his wagon and ran behind it. Defendant dismounted and followed witness, who then fled from the rear to the side of the wagon, and finally sought refuge under the wagon, at the same time protesting that he had done nothing to injure or offend the defendant, and begging defendant not to shoot. Witness then reminded defendant that he was unarmed and in the power of the defendant. Defendant then lowered his gun and witness got back on his

wagon and seized the lines to drive on home. Defendant then covered the witness with his gun, pointing the muzzle at witness's head, and told the witness that he would fire if witness moved. He again said that witness was a d—d son of a b—h, and that he was going to kill witness, although witness might think him jesting. He then lowered his gun from the witness's head in line with his body, and said: "G—d d—n you, I will just shoot you a little to see you jump." He then fired one barrel of his gun, lodging the charge in the witness's foot, which was resting on the dash board of the wagon. The shot carried off the witness's little toe and the toe next to it. On being shot the witness sprang from his wagon. Defendant ordered witness to get back on his wagon and go on, and said that when witness reached a certain tree on the road he was going to shoot to kill. Witness drove on, followed by defendant, until the cross road leading to J. D. Hunter's house was reached, when defendant told witness to go on and get his foot dressed, and that he would pay for it; that he had acted the fool in shooting witness, but that if witness filed a complaint against him, or made an effort to prosecute him, he would kill witness. Defendant then left, going in the direction of J. D. Hunter's house.

Cross examined, the witness stated that he knew of no reason for the conduct of the defendant. Witness had never had any personal trouble with defendant beyond the ill feeling which grew out of a small law suit in the justice's court. Several months had then elapsed since the defendant had sued the witness and recovered judgment against him in the justice's court at Roanoke. Witness did not go to the road over which defendant was traveling when defendant first approached that part of Reynolds's pasture in which the witness was getting wood. Witness did not draw his axe on defendant, nor did he seize the bridle reins of the defendant's horse. A four wire fence was between the defendant and witness. Witness at no time or place told one Marshall that he went into the road to kill the defendant with his axe, and that defendant was saved only by his horse pulling loose from witness. Witness and Marshall did not speak, and had not spoken to one another for several months prior to the said April 7, 1886, when witness lost a horse which Marshall said the witness accused him of stealing. Witness did not start towards the defendant to kill him with the axe when defendant overtook him on the road.

Doctor P. C. Bush testified, for the State, that he was called to

see Marsters on the seventh day of April, 1886. He found him suffering from a gun shot wound in the left foot. The small toe was hanging by a small thread of skin, and the next toe was so badly shot that it had to be amputated. No medical skill could have saved either toe. The third toe was badly wounded, but was saved. Witness removed a number three buck shot from Marsters's instep. Witness knew nothing of the shooting except what Marsters told him. He found a spot of blood on the step of the wagon, near the brake, and a small buck shot lying loose on the step. He could find no shot impression on the wagon.

William Roberts testified, for the State, that he was plowing in Reynolds's field on April 7, 1886. He saw Marsters pass that field on that morning, going after wood. Defendant soon passed, going in the same direction. After a short time the defendant went back over the same route, and up to J. D. Hunter's house, stopping at the gate. Hunter joined him at the gate, and stood there a few minutes. He then went into his house and soon returned with a gun, which he gave to the defendant. Defendant turned immediately and galloped back down the road, and as he passed the witness, with the double barreled shot gun in his hands, he remarked, "I am going to give the colonel hell." By "colonel" he meant C. B. Marsters. Witness went on up the road and soon heard the report of a gun, which appeared to be fired at a point some six or seven hundred yards distant. The State closed.

J. D. Hunter was the first witness for the defense. He testified that, on the morning of April 7, 1886, the defendant rode up to his house and asked for his gun, saying that he had just seen a drove of turkeys in the neighborhood, and wanted to shoot one. Witness got his gun from the house, handed it to the defendant, and the latter rode off. A shot was soon fired at a distance of five hundred yards from the house. Witness could see no one at the time, but heard talking, and distinctly heard the defendant say: "I will learn you how to draw an axe on me!" Soon afterwards witness saw Marsters on his wagon, and defendant on his horse, traveling alongside, come up the road. They separated at the forks of the road. Marsters went on home, and defendant rode up to the witness's gate and threw the gun into the yard and left. On his cross examination, the witness stated that he loaded the gun, but he was not permitted

to state why he loaded it, or whether or not he loaded it for the purpose of killing Marsters.

One Marshall testified, for the defense, that he saw the defendant and Marsters together in the road near Reynolds's pasture fence on the morning of April 7, 1886. Witness was travelling the road towards them when he saw them. Marsters had hold of the reins of the defendant's horse, and held an axe in his other hand. The horse seemed to pull loose from Marsters when defendant rode off up the road towards Hunter's house, and Marsters remained standing in the road until witness reached him. He still held his axe, and proceeded to tell witness about the difficulty. He said the defendant was saved only by his d—d fool horse. In speaking of defendant he spoke of him as the "d—d son of a b—h." Witness then left and had gone at least a quarter of a mile when he heard the report of the gun. Witness had since, while Marsters was engaged chopping cotton, had some conversation with him.

Cross examined, the witness testified that he lived at Bruce Wheeler's. He had been to Esquire Selbee's house, and was on his way home when he saw defendant and Marsters, as stated. He saw them about two miles from Selbee's house. Witness had lived in Arizona, removing from Denton county, and went thence back to Denton. Prior to his visit to Arizona he lived at J. D. Hunter's, where defendant then lived. Witness could not say that his feeling towards Marsters was especially unfriendly. Marsters was once said to have made a hard statement about witness, which gave rise to temporary hard feeling, but, being asked about it by witness, Marsters denied that he made the statement.

The prosecuting witness, Marsters, recalled by the State in rebuttal, denied specifically the statements of Marshall, and testified that he did not see Marshall on the day of the shooting, and that not one word had passed between him and Marshall since at least four months prior to the shooting.

The motion for new trial raised the question discussed in the opinion.

*Smith & Bottorff*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON. JUDGE.    Maiming. by our·Penal Code, is defined as
follows :  "To maim is to wilfully and maliciously cut off or oth-
erwise deprive a person of the hand, finger, toe, foot, leg, nose,.
or ear ; to put out an eye, or in anyway deprive the person of
any other member of his body." (Penal Code, Art. 507.)

In this case the defendant was charged by proper indictment.
with having maimed C. B. Marsters by shooting off a toe of the
said Masters.    This charge is amply supported by the evidence
as to the act of shooting, and the result of such act, and the only
question presented by the record which we deem worthy of con-
sideration, is as to the correctness of the charge of the court.
with reference to the facts of the case.    After giving the statu-
tory definition of maiming, the charge explains the meaning of
the words "wilfully and maliciously," as used in said defini-
tion, and the explanation so given is in accordance with the de-
cisions of this court made under similar statutes, and is in our
opinion correct.   (Thomas v. the State, 14 Texas Ct. App., 200 ;.
Shubert v. the State, 16 Texas Ct. App., 645 ; Trice v. the State,
17 Texas Ct. App., 43 ; McKinney v. the State, 8 Texas Ct. App..
626.)

It is insisted by counsel for the defendant that the word " wil-
fully," as used in this statute, means more than it has been held
to mean in other cases ; that it means not only that the act
causing the injury was intentional, but that the party inflicting·
the injury intended the probable result of the act.    In other
words, that it means a specific intent on the part of the person
inflicting the injury to *maim* the person injured, or that the per-
son inflicting the injury must have known at the time that the
means used by him was calculated to *maim*.

If this had been a prosecution for an assault with intent to.
maim, the specific intention to maim would be essential, and it.
would have been error if the court had failed to so instruct the ·
jury.    But where, as in this case, the maiming was actually
effected, if the act was committed with the evil intent, with le-
gal malice, without reasonable ground for believing it to be law-
ful, and without legal justification, it was wilful and malicious,
whether or not it was committed with a specific intent to maim.
And if the means used in the commission of the offense were·
such as would, in the manner used, ordinarially result in maim-
ing, the law presumes that· the intention was to maim (Penal
Code, Art. 50), without regard to the knowledge of the party using·
such means as to whether or not the same were calculated to

maim. In our opinion the court charged the law of this case fully, fairly and correctly, and did not err in refusing the special charges requested by the defendant.

When considered as a whole, and with reference to the facts of the case, we are of the opinion that the charge is unobjectionable. It was proper that the court should instruct the jury that under this indictment the defendant could not be convicted of an assault with intent to murder. This instruction was favorable to the defendant, and was warranted by the evidence, because there was evidence tending to show that the defendant had committed an assault upon Marsters with intent to murder him, just prior to maiming him, and it was necessary, in view of such evidence, that the jury should be instructed to confine themselves to a consideration of the offense charged in the indictment.

In our judgment the evidence fully warrants the conviction, and, finding no error in the judgment, it is affirmed.

*Affirmed.*